# STATE OF MICHIGAN

# COURT OF APPEALS

---

WELLS FARGO BANK, N.A., Trustee for
OPTION ONE MORTGAGE LOAN TRUST
2005-2 ASSET BACKED CERTIFICATES,
SERIES 2005-2,

        Plaintiff-Appellant,

v

SBC IV REO, LLC, and CAPITOL NATIONAL
BANK,

        Defendants-Appellees.

FOR PUBLICATION
November 29, 2016
9:00 a.m.

No. 328186
Mackinac Circuit Court
LC No. 2014-007577-CH

---

Before: MARKEY, P.J., and MURPHY and RONAYNE KRAUSE, JJ.

MURPHY, J.

This case primarily concerns a purported discharge of mortgage and the doctrine of equitable subrogation, which "is available to place a new mortgage in the same priority as a discharged mortgage if the new mortgagee was the original mortgagee and the holders of any junior liens are not prejudiced as a consequence." *CitiMortgage, Inc v Mtg Electronic Registration Sys, Inc*, 295 Mich App 72, 81; 813 NW2d 332 (2011). The loan obtained by the mortgagors and secured by the "new" mortgage at issue in this lawsuit was used, *in part*, to fully satisfy and discharge the original mortgage, with both mortgages being held by the same mortgagee. A second and different mortgagee had recorded its mortgage relative to the same real property during the interim, making it a junior lienholder at the time of recordation. The loan secured by the new mortgage exceeded the amount due under the original note, and the mortgagors, for the most part, pocketed the remaining loan proceeds. Thus, the new loan and mortgage involved more than a mere refinancing transaction; there was an increase in the principal amount. The closing on the new mortgage entailed a faxed discharge of mortgage from the junior lienholder that was ultimately never recorded, given that, according to the junior lienholder, the discharge was conditioned on no new money being lent and on the preparation and recording of a mortgage to replace the discharged mortgage, neither of which conditions was met. Subordination of mortgages under the process outlined in MCL 565.391 was not attempted. Several years later, the mortgagors defaulted on the mortgage that had originally been recorded second in time, and foreclosure proceedings were commenced by an assignee traced back to the one-time junior lienholder, resulting in the assignee's purchase of the real property at a sheriff's sale. An assignee of the mortgagee that had held the original and new mortgages then instituted the current action, alleging various causes of action and claiming priority of its assigned mortgage interest on the basis of the discharge of mortgage and equitable subrogation. The main

-1-

questions posed in this appeal regard the validity of the discharge and the applicability of the doctrine of equitable subrogation under the described circumstances. Arguments in favor of the doctrine's applicability and the discharge's validity were advanced by plaintiff Wells Fargo Bank, N.A., as Trustee for Option One Mortgage Loan Trust 2005-2 Asset Backed Certificates, Series 2005-2 (Wells Fargo). The trial court rejected Wells Fargo's attempt to employ equitable subrogation and the discharge to its benefit, granting summary disposition in favor of defendants SBC IV REO, LLC (SBC), and Capitol National Bank (Capitol). Wells Fargo appeals as of right, and we hold that the discharge of mortgage was ineffective and unenforceable as a matter of law for failure to satisfy conditions precedent, but that equitable subrogation is available to Wells Fargo, albeit to the exclusion of the new or additional monies. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

In December 2003, two individuals, as tenants in common, granted a mortgage to Option One Mortgage Corporation (Option One) on certain real property located in Mackinac County, securing a $449,000 loan made by Option One to the mortgagors under a promissory note. The mortgage was recorded that same month. In August 2004, the same mortgagors, joined by a spouse in order to bar any right of dower, granted a $400,000 mortgage to Capitol with respect to the same real property encompassed by the first mortgage, partially securing a loan in excess of $1 million. This mortgage was recorded in September 2004, and for purposes of this opinion and ease of reference, we shall refer to it as the Capitol mortgage.

In April 2005, the two mortgagors granted a "new" mortgage to Option One in regard to the real property, securing a $520,000 loan. According to the settlement statement pertaining to the closing, $458,109 of the loan proceeds were used to pay off the entire balance on Option One's original mortgage and, after disbursements to cover settlement charges and delinquent taxes, the mortgagors received the remaining $34,566. This mortgage was recorded in May 2005, and we shall refer to it as the Option One mortgage.[1] In June 2005, Option One recorded a satisfaction of mortgage with respect to its original mortgage. There was no modification of the original Option One mortgage; rather, it was completely discharged and replaced. The satisfaction of mortgage provided that "Option One . . . has received full payment of [the] promissory note, acknowledged satisfaction of said mortgage and hereby directs the clerk of the Circuit Court of the above described county to cancel the same of record."

We must take a moment to explore the circumstances surrounding the closing relative to the Option One mortgage. A couple of months prior to the closing,[2] the title company prepared a commitment for title insurance in regard to the planned transaction, which acknowledged the Capitol mortgage and the original Option One mortgage in schedule B, section 1 of the commitment, and which called for a discharge of those mortgages at the closing, otherwise they would be shown as being excepted on the final title insurance policy. Closing instructions from Option One to the closing agent directed that the mortgage must record in "First Lien Position."

---

[1] With respect to the initial mortgage in 2003, we shall refer to it as the "original" Option One mortgage.

[2] The closing on the Option One mortgage took place on April 15, 2005.

Given the existence of the Capitol mortgage, the closing agent or someone from the title company contacted Capitol in order to obtain a discharge of the Capitol mortgage, conceptually allowing for a priority recording of the Option One mortgage upon discharge of the Capitol mortgage, followed by the recording of a newly-prepared replacement mortgage in favor of Capitol, with Capitol thereby retaining its junior lienholder position.

An assistant vice-president for Capitol faxed a discharge of mortgage to the title company's closing department. In an affidavit obtained for purposes of the litigation, the assistant vice-president averred that she had faxed the discharge of mortgage under the belief that the Option One mortgage only entailed the refinancing of the original mortgage, "without the new loan advancing any new money that would be secured with [the] new mortgage." She further averred:

> In response to the Title Company Request[,] I had prepared and executed the Discharge of Mortgage . . ., telefaxed the Discharge of Mortgage to the Title Company representative and advised the representative from the Title Company that the original Discharge of Mortgage would be provided and could be recorded upon confirmation that no new money was being loaned to [the mortgagors] and . . . that [the] Title Company would record the replacement [Capitol] Mortgage to secure [Capitol's] position. This would have been the standard practice of [Capitol], in that an original, effective, recordable discharge of mortgage would not be provided until either funds were obtained to pay-off the [Capitol] loan secured by the mortgage or [Capitol's] equity position was not in any way impaired and a replacement mortgage was prepared and recorded or to be recorded contemporaneous with the discharge. If the title company had requested an original, recordable discharge of mortgage, [Capitol's] practice would have been to provide it to the title company in escrow subject to an agreement that it could only be released and recorded when these conditions had been met.

The assistant vice-president also indicated that the Capitol mortgage was not paid off, that the Option One mortgage "was for an increased principal amount," and that no replacement mortgage was recorded on behalf or in favor of Capitol. And, therefore, the conditions precedent to Capitol's agreement to discharge the mortgage were never satisfied. In turn, according to the assistant vice-president, Capitol did not record the discharge of mortgage, nor was a discharge ever effectively delivered.[3] In a letter from the title company to Option One dated April 15, 2005, Option One was informed that the closing had occurred, that the title company had "completely disbursed the mortgage in the amount of $520,000," and that the mortgage constituted "a valid first lien on the property, subject only to those encumbrances shown in

---

[3] In her affidavit, the assistant vice-president additionally averred that a Capitol loan presentation document, which is part of the record, had been prepared by her or under her direction, reflecting a request by the mortgagors for Capitol to provide a discharge of mortgage conditioned on no new money being advanced and the recording of a replacement mortgage. The averment is consistent with the loan presentation document.

-3-

Schedule B, Section II of [the] commitment."[4]  In the title insurance policy dated May 2, 2005, there is an express exception for the Capitol mortgage, specifying that the policy did not insure against loss or damage arising out of the Capitol mortgage.

In August 2005, a few months after the closing on the Option One mortgage, one of the mortgagors conveyed his tenants-in-common interest in the property to the other mortgagor pursuant to a quitclaim deed.  In May 2009, American Home Mortgage Servicing, Inc. (American Home), as successor-in-interest to Option One, assigned the Option One mortgage to Wells Fargo.  However, in August 2011, Wells Fargo recorded an affidavit to expunge or rescind the assignment, claiming that it was not executed by an authorized signer for American Home.  But then in March 2012, Sand Canyon Corporation, formerly known as Option One, executed and recorded an assignment that assigned the Option One mortgage to Wells Fargo.  At the time of the instant litigation, Wells Fargo held the Option One mortgage.  The lower court record contains various documents, including title worksheets contemplating foreclosure on the Option One mortgage, property reports, demands on the title insurance policy relative to the Option One mortgage, a fax seeking to obtain the discharge of mortgage, and law firm communications to its client, Option One and later Wells Fargo, that were dated from before the failed May 2009 assignment to Wells Fargo to after the successful March 2012 assignment to Wells Fargo.  These documents made clear that, *for purposes of the public record at the register of deeds office*, the Capitol mortgage remained in existence, it had not been discharged, and it was superior to the Option One mortgage.  The documents further reflected that Wells Fargo was well aware of these facts and the lack of a recorded discharge of mortgage before accepting the 2009 and 2012 assignments, although Wells Fargo did not appear to know the reasons why the discharge had not been recorded.  Evidently, the Option One mortgage had been in default, but foreclosure proceedings were not pursued, ostensibly because of the Capitol mortgage conundrum.

On March 11, 2013, in an earlier, separate lawsuit, Wells Fargo filed a quiet-title action against Capitol, acknowledging the Option One and Capitol mortgages and Wells Fargo's status as an assignee of the Option One mortgage, and alleging that the Option One mortgage was superior.  Wells Fargo asserted that Capitol's mortgage had "been paid off or otherwise satisfied, however no discharge of mortgage ha[d] been recorded and [Capitol's] mortgage remain[ed] in senior lien position[,]" even though the Option One mortgage "was intended to be a senior mortgage on the Property."  Wells Fargo further alleged that Capitol's "failure to record a discharge of mortgage [was] creating a cloud on [Wells Fargo's] claim to the Subject Property[.]"  Wells Fargo asked the circuit court to discharge the Capitol mortgage, terminate any interest in the property claimed by Capitol, and to recognize the Option One mortgage now held by Wells Fargo as the senior lien on the property.

On May 31, 2013, while Wells Fargo's quiet-title action remained pending, Capitol assigned its mortgage to SummitBridge Credit Investments IV, LLC (SummitBridge), upon SummitBridge's purchase of the underlying loan.  The assignment was recorded on August 8, 2013.  Also on August 8, 2013, Wells Fargo and Capitol stipulated to the dismissal of Wells

---

[4] We note that schedule B, section 2 of the title commitment did not reference the Capitol mortgage as suggested by SBC and Capitol.  Instead, as stated earlier, it was section 1 of schedule B of the commitment that referred to the Capitol mortgage, as well as to the original Option One mortgage.

Fargo's quiet-title action without prejudice, with the circuit court entering an order to that effect on August 20, 2013.[5]  On August 27, 2013, SummitBridge assigned the Capitol mortgage to SBC, which was a SummitBridge affiliate.  At the time of the instant litigation, SBC held the Capitol mortgage.

An asset manager connected to SummitBridge and SBC executed an affidavit in which he averred that in entering into the loan purchase agreement and related assignment with Capitol, SummitBridge had relied on the Capitol mortgage being a first or senior mortgage on the real property.  The asset manager further asserted that "[n]either SummitBridge nor SBC received any notice from Option One, Wells Fargo or any other entity or person of the existence of a copy or original of the document entitled "Discharge of Mortgage" referenced in, and attached as Exhibit F, to Wells Fargo's Complaint [in the instant action], until on or about May 14, 2014."  The asset manager additionally averred that had SummitBridge been informed of the allegations made by Wells Fargo concerning equitable subrogation and the purported discharge of the Capitol mortgage prior to SummitBridge's purchase of the Capitol loan, "it would have either not have entered into the Loan Purchase or would have otherwise paid a purchase price substantially less than that which was agreed thereunder."[6]

In a notice of foreclosure sale dated October 31, 2013, SBC indicated that there had been a default relative to the Capitol mortgage, with nearly $700,000 due and owing on the

---

[5] In an email to Wells Fargo from its attorney who had represented Wells Fargo in the quiet-title action, counsel stated:

> As previously discussed, this file was referred to our office for a quiet title action to remove a senior lien, however, we cannot maintain a claim as our mortgage is in junior lien position to that of Capitol . . . . At the time of closing, there were two prior mortgages, however only one was paid off at closing, thus the Capitol mortgage was never paid off and remains in valid senior lien position. The QTA [quiet-title action] has been dismissed and I have attached a copy of the Order. We will be closing our file at this time.

[6] We note that the asset manager averred that SBC, as an assignee of the Capitol mortgage, "was made aware of the civil action filed by Wells Fargo against [Capitol] . . . in 2013," which was a reference to the dismissed quiet-title action.  The asset manager did not state that SummitBridge had been aware of the pending quiet-title action when Capitol assigned its mortgage and sold the loan to SummitBridge in May of 2013.  Ultimately, the record does not indicate whether SummitBridge had knowledge of the quiet-title action against Capitol when Capitol sold its loan and assigned the mortgage to SummitBridge; the record does not contain a lis pendens related to the quiet-title action.  The quiet-title action's mention of a discharge, as stated earlier, was couched in terms of the Capitol mortgage having "been paid off or otherwise satisfied."  And there was no allegation that a discharge had been faxed or delivered for purposes of the closing on the Option One mortgage, so as to allow the realignment of lien priority as described by Capitol's assistant vice-president and discussed above.  There is no dispute that the Capitol mortgage was not paid off or otherwise satisfied.

-5-

promissory note.[7] The foreclosure sale was scheduled for and conducted on December 5, 2013, where SBC purchased the property for $371,000 under a sheriff's deed. A six-month redemption period applied and was set to expire on June 4, 2014.

On May 22, 2014, Wells Fargo filed its complaint in the present action against Capitol and SBC, alleging six separate counts. In count I of the complaint, Wells Fargo alleged that Capitol had unlawfully failed to discharge the Capitol mortgage. Wells Fargo asserted that Capitol had a statutory obligation to file or record the discharge of mortgage that had been faxed to the title company for purposes of the closing on the Option One mortgage. Wells Fargo further alleged that Option One had only agreed to the new mortgage on the condition that it would retain first priority lien position, that Capitol had induced Option One into proceeding with the closing and new mortgage by agreeing to the discharge, that Capitol faxed a discharge of mortgage to the closing agent, and that Capitol then failed to record the discharge. In count II of the complaint, Wells Fargo alleged common-law indemnity, claiming that Capitol should indemnify Wells Fargo for any monies required to be paid in order to redeem the property. The basis for the indemnity claim was that Capitol's failure to honor and record the discharge of mortgage was wrongful. In count III of the complaint, Wells Fargo alleged fraud and misrepresentation, once again relying on the underlying facts surrounding the faxed discharge of mortgage and Capitol's failure to record the discharge. In count IV of the complaint, Wells Fargo assumed the record priority of the Capitol mortgage and alleged equitable subrogation, which, as explained in the opening paragraph of this opinion, "is available to place a new mortgage in the same priority as a discharged mortgage if the new mortgagee was the original mortgagee and the holders of any junior liens are not prejudiced as a consequence." *CitiMortgage*, 295 Mich App at 81. In count V of the complaint, Wells Fargo alleged a claim to determine an interest in land under MCL 600.2932, contending that the Option One mortgage assigned to Wells Fargo was "superior to all other liens" that might encumber the property. Although not directly expressed in count V, which constituted a quiet-title claim, the allegations contained therein in support of Wells Fargo's contention that it held the senior lien on the property essentially reflected reliance on the doctrine of equitable subrogation and on the unrecorded discharge of mortgage. In count VI of the complaint, Wells Fargo alleged that the foreclosure by advertisement conducted by SBC was invalid, given that SBC had no interest in the property to foreclose upon in light of Capitol's discharge of the mortgage. As gleaned by review of the six counts in Wells Fargo's complaint, it becomes clear that the case ultimately boils down to two broad primary issues, i.e., the applicability of equitable subrogation and the validity and enforceability of the faxed discharge of mortgage.

Contemporaneous to the filing of its complaint, Wells Fargo filed a motion for a temporary restraining order (TRO), show cause order, and for a preliminary injunction, seeking to toll the running of the redemption period arising out of the foreclosure sale. On the day of the filing of the complaint and motion, the trial court entered an ex parte TRO, tolling the redemption period until further order of the court and setting the matter for a hearing on June 20, 2014. The hearing was conducted as scheduled, and by order dated June 23, 2014, the trial court

---

[7] Although the Capitol mortgage was for $400,000, the underlying loan, as mentioned earlier, exceeded $1 million, and the loan was secured by not only the real property at issue here, but additional forms of collateral.

converted the TRO to a preliminary injunction and extended the redemption period for 14 days. By amended order dated June 30, 2014, the trial court reversed its position and dissolved and terminated the TRO and preliminary injunction, concluding that SBC had been a bona fide purchaser without notice of any alleged mortgage discharge and thus Wells Fargo could not establish a threat of irreparable harm or a likelihood of prevailing on the merits.

The parties filed multiple competing motions for summary disposition, and after entertaining oral argument on the issues at two hearings, the trial court entered a couple of orders denying Wells Fargo's motion for summary disposition and granting summary disposition in favor of SBC and Capitol for the reasons stated on the record at a hearing on May 22, 2015. At that hearing, the trial court initially observed that "[t]here wasn't a discharge." The court stated that the discharge of the Capitol mortgage was subject to a "condition precedent" of being paid off and that "within two weeks' time, everybody knew that [the] mortgage was still there." With respect to equitable subrogation, the trial court found that *CitiMortgage* was distinguishable and did not support application of the doctrine, considering that, relative to the Option One mortgage, "the new money made it a new mortgage and not a refinance[.]" The trial court also concluded that the equitable subrogation claim was time-barred under a six-year statute of limitations and that prejudice would be incurred if the doctrine was invoked. For these reasons, the trial court granted summary disposition in favor of SBC on counts IV (equitable subrogation), V (superior interest in land), and VI (invalid foreclosure), which were the only counts applicable to SBC, under MCR 2.116(C)(7), (8), and (10). The trial court indicated that counts IV through VI were inapplicable to Capitol; nonetheless, the court granted summary disposition in favor of Capitol on those counts.

With respect to counts I (failure to honor and record discharge of mortgage) and II (common-law indemnity), which were solely applicable to Capitol, the trial court granted summary disposition under MCR 2.116(C)(7) on the basis that the claims were time-barred pursuant to a six-year statute of limitations and under MCR 2.116(C)(8) for failure to state a claim. In regard to count III (fraud and misrepresentation), which also pertained solely to Capitol, the trial court ruled:

> As to the fraud claims, the statute requires a clear and convincing demonstration that some fraud has occurred, and the Court just does not see it based on the pleadings and the arguments that have been made by Counsel.

Wells Fargo appeals as of right.

## II. ANALYSIS

## A. STANDARD OF REVIEW

We review de novo a trial court's ruling on a motion for summary disposition, *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011), matters of statutory construction, *Snead v John Carlo, Inc*, 294 Mich App 343, 354; 813 NW2d 294 (2011), whether a cause of action is time-barred, *Caron v Cranbrook Ed Community*, 298 Mich App 629, 635; 828 NW2d 99 (2012), the applicability of equitable subrogation, *CitiMortgage*, 295 Mich App at 75, and questions of law generally, *id.*

## B. SUMMARY DISPOSITION TESTS

The trial court relied on MCR 2.116(C)(7), (8), and (10) in ruling on the motions for summary disposition. With respect to MCR 2.116(C)(7), which provides, in part, for summary dismissal when an action is barred by a statute of limitations, this Court in *RDM Holdings, Ltd v Continental Plastics Co*, 281 Mich App 678, 687; 762 NW2d 529 (2008), observed:

> Under MCR 2.116(C)(7) . . ., this Court must consider not only the pleadings, but also any affidavits, depositions, admissions, or other documentary evidence filed or submitted by the parties. The contents of the complaint must be accepted as true unless contradicted by the documentary evidence. This Court must consider the documentary evidence in a light most favorable to the nonmoving party. If there is no factual dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide. If a factual dispute exists, however, summary disposition is not appropriate. [Citations omitted.]

In regard to MCR 2.116(C)(8), which provides for summary disposition when a "party has failed to state a claim on which relief can be granted," it tests the legal sufficiency of a complaint. *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). The trial court may only consider the pleadings in rendering its decision. *Id.* All factual allegations in the complaint must be accepted as true. *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 380-381; 563 NW2d 23 (1997). "The motion should be granted if no factual development could possibly justify recovery." *Beaudrie*, 465 Mich at 130.

Finally, with respect to the well-established principles governing a motion for summary disposition brought pursuant to MCR 2.116(C)(10), this Court in *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), explained:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

## C. DISCUSSION

### 1. PURPORTED DISCHARGE OF CAPITOL MORTGAGE

Counts I, II, III, V (in part), and VI of Wells Fargo's complaint were reliant on the discharge of mortgage that the assistant vice-president for Capitol had faxed to the closing department of the title company handling the closing on the 2005 Option One mortgage. Count I alleged an unlawful failure to discharge the mortgage and record the discharge; count II alleged common-law indemnity predicated on a failure to honor and record the discharge; count III alleged fraud and misrepresentation for Capitol's failure to follow through and record the discharge as promised; count V sought a determination that Wells Fargo's mortgage interest was superior to SBC's mortgage interest based, in part, on the discharge of the Capitol mortgage; and count VI alleged that SBC's foreclosure was invalid because there was no mortgage to foreclose upon given the discharge.

Within the pertinent time period, as prescribed by MCL 565.44(2), "after a mortgage has been paid or otherwise satisfied, the mortgagee . . . shall prepare a discharge of the mortgage, file the discharge with the register of deeds for the county where the mortgaged property is located, and pay the fee for recording the discharge." MCL 565.41(1). A mortgagee is liable for statutory and actual damages for refusing or neglecting to discharge a mortgage "after full performance of the condition of the mortgage, . . . or, if the mortgage is entirely due, after a tender of the whole amount due[.]" MCL 565.44(1).

There is no dispute that the mortgagors did not pay off, satisfy, or fully perform the conditions of the Capitol mortgage, so there was no general statutory entitlement to a discharge of mortgage. Rather, this case presented an attempted subordination of mortgages as between the Capitol and Option One mortgages, through the planned use of a discharge of mortgage and a replacement mortgage, whereby Option One would retain its superior lien position despite recording the 2005 Option One mortgage *after* the 2004 Capitol mortgage had been recorded. See *Black's Law Dictionary* (7th ed) (defining a "subordination agreement" as "[an] agreement by which one who holds an otherwise senior interest agrees to subordinate that interest to a normally lesser interest"). Stated otherwise, Option One and Capitol contemplated subordination of Capitol's first lien to a second or junior lien, although not through the mechanism set forth in MCL 565.391.[8] The principles and rules governing the construction, application, and

---

[8] MCL 565.391 provides:

> When any mortgagee named in any mortgage of property within this state, or the party or parties to whom such mortgage has been properly assigned of record, desire to waive the priority of said mortgage in favor of any other lien or mortgage, the holder thereof may in writing on said mortgage, or by separate instrument duly acknowledged and witnessed in the same manner as is provided for deeds and other instruments for the transfer of an interest in real estate, waive the priority of said mortgage in favor of any other mortgage or lien, to the extent of the lien of the mortgage so waived and such waiver when recorded whether upon the margin of the record, or as a separate instrument, shall be constructive notice thereof to all persons dealing with the mortgage, the lien of which has been

enforceability of contracts generally apply to subordination agreements. *Conagra, Inc v Farmers State Bank*, 237 Mich App 109, 131-132; 602 NW2d 390 (1999).

The law of contracts recognizes that some agreements are not binding at the outset with respect to a right to performance, entailing conditions precedent to performance. *Harbor Park Market, Inc v Gronda*, 277 Mich App 126, 131-132; 743 NW2d 585 (2007). In *Harbor Park*, this Court observed:

> A condition precedent . . . is a fact or event that the parties intend must take place before there is a right to performance. If the condition is not satisfied, there is no cause of action for a failure to perform the contract. However, . . . promisors . . . cannot avoid liability on [a] contract for the failure of a condition precedent where they caused the failure of the condition. As the Supreme Court has stated, when a contract contains a condition precedent, there is an implied agreement that the promisor will place no obstacle in the way of the happening of such event. Where a party prevents the occurrence of a condition, the party, in effect, waives the performance of the condition. Hence, the performance of a condition precedent is discharged or excused, and the conditional promise made an absolute one. [*Id.* (citations, quotation marks, and ellipses omitted).]

In 1 Cameron, *Michigan Real Property Law* (3d ed), Real Estate Sale Contracts, § 15.45, pp 553-554, the author discussed conditions precedent in the context of real estate transactions, stating:

> Many real estate sale contracts contain conditions precedent that must be met before either the buyer or the seller has an obligation to proceed. A condition precedent is distinguished from a promise in that it creates no right or duty in itself but is merely a limiting or modifying factor. Rezoning, the availability of financing, tax abatement, and the ability of one party to sell or purchase other real estate are often the subject of common conditions precedent in real estate sale contracts. . . . Once a condition has been fulfilled, the contract ceases to be conditional. [Citations omitted.]

Given the uncontradicted affidavit executed by Capitol's assistant vice-president, which was also consistent with the Capitol loan presentation document, see footnote 3, we conclude as a matter of law that Option One and Capitol had, at most, a conditional subordination agreement. Under the conditional agreement, Capitol was obligated to discharge the mortgage and record the discharge, but only if no new money was lent to the mortgagors as part of the Option One mortgage and a replacement mortgage was prepared and recorded in favor of Capitol. There is no genuine issue of material fact that neither of these conditions was satisfied, nor that Capitol engaged in conduct to prevent the occurrence of the conditions. Accordingly, Capitol had no

so waived, or with property described in said mortgage, from the date of filing said waiver for record. If said waiver be a separate instrument, it shall be recorded in the same manner provided for the recording of discharges of mortgages, and the recorder shall be entitled to the same fees for recording waivers of priority as are charged for assignments and discharges of mortgages.

legal obligation to perform by way of honoring and recording the faxed discharge of mortgage; the purported discharge was ineffective and unenforceable.

Although the trial court alluded to a variety of reasons to dismiss the counts at issue, including expiration of the statute of limitations, failure to state a claim, and the lack of clear and convincing evidence relative to the fraud and misrepresentation count, the court also found that "[t]here wasn't a discharge."[9] Our holding is that there was no effective and valid discharge of the Capitol mortgage in light of the conditions precedent and the failure of those conditions, as conclusively established by the assistant vice-president's affidavit and the loan presentation document, which evidence was not contradicted by any documentary evidence submitted by Wells Fargo. Absent an enforceable promise to discharge the mortgage and record the discharge, there could be no unlawful failure to record the discharge, no basis for common-law indemnification, no foundation for fraud and misrepresentation, no reason to conclude that the Option One mortgage was the senior lien for purposes of the public record, and no grounds to invalidate SBC's foreclosure on the property. Therefore, the trial court did not err in summarily dismissing Counts I, II, III, V (as premised on the discharge), and VI of Wells Fargo's complaint, albeit for reasons that differ from those expressed by the trial court. See *Snead*, 294 Mich App at 358. Given our holding, it is unnecessary to examine the other arguments posed by Wells Fargo regarding the disposed-of counts.

## 2. EQUITABLE SUBROGATION

In general, Michigan is a race-notice state under MCL 565.29, wherein the owner of an interest in land can protect his or her interest by properly recording it and the first to record an interest typically has priority over subsequent purchasers or interest holders. *Coventry Parkhomes Condo Assoc v Fed Nat'l Mtg Assoc*, 298 Mich App 252, 256; 827 NW2d 379 (2012); *Richards v Tibaldi*, 272 Mich App 522, 539; 726 NW2d 770 (2006).[10] Before its amendment pursuant to 2008 PA 357, MCL 565.25 provided, in part, as follows:

---

[9] The trial court subsequently mentioned the failure of a "condition precedent" coming to fruition, but couched it in terms of the condition being the payoff of the Capitol mortgage.

[10] MCL 565.29 provides, in relevant part:

> Every conveyance of real estate within the state hereafter made, which shall not be recorded as provided in this chapter, shall be void as against any subsequent purchaser in good faith and for a valuable consideration, of the same real estate or any portion thereof, whose conveyance shall be first duly recorded.

The term "conveyance" as used in MCL 565.29 "embrace[s] every instrument in writing, by which any estate or interest in real estate is created, aliened, *mortgaged* or assigned . . . ." MCL 565.35 (emphasis added); see also *Mich Fire & Marine Ins Co v Hamilton*, 284 Mich 417, 419; 279 NW 884 (1938) (race-notice statute applies to mortgages); *Coventry Parkhomes*, 298 Mich App at 256 (observing that MCL 565.29 and the principle that the first to record has priority apply to liens and mortgages); *Church & Church, Inc v A-1 Carpentry*, 281 Mich App 330, 345; 766 NW2d 30 (2008) (MCL 565.29 "applies to mortgages"), vacated in part and aff'd in part on other grounds 483 Mich 885 (2009).

(1) . . . In the entry book of mortgages the register shall enter all mortgages and other deeds intended as securities, and all assignments of any mortgages or securities.

* * *

(4) The instrument shall be considered as recorded at the time so noted and shall be notice to all persons except the recorded landowner subject to subsection (2), of the liens, rights, and interests acquired by or involved in the proceedings. *All subsequent owners or encumbrances shall take subject to the perfected liens, rights, or interests.* [1996 PA 526 (emphasis added).]

Under this statutory language, mortgages were subject to the satisfaction of the obligation on a mortgage note in the order in which the mortgages were recorded. *Ameriquest Mtg Co v Alton*, 273 Mich App 84, 93; 731 NW2d 99 (2006).[11] In *Ameriquest*, this Court held that "[b]ecause MCL 565.25(4) plainly provides for priority designation based on date of recordation," a party must allege and show fraud, mutual mistake, or some other unusual circumstance in order to invoke the doctrine of equitable subrogation. *Id.* at 99-100. The ruling in *Ameriquest* severely restricted the availability of equitable subrogation to mortgagees seeking to retain a senior lien position. See *id.* at 100 (our holding issued on the basis of MCL 565.25 "effectively abolishes the doctrine of equitable subrogation in its known form relative to mortgage priority and foreclosure disputes") (MURPHY, J., concurring).

Pursuant to 2008 PA 357, the Legislature rewrote subsection (1) of MCL 565.25 and entirely repealed and deleted subsection (4) of the statute. In revisiting the doctrine of equitable subrogation following the ruling in *Ameriquest*, this Court in *CitiMortgage*, 295 Mich App at 75, stated:

Under Michigan's former race-notice recording statute, MCL 565.25(1) and (4), as amended by 1996 PA 526, a first-recorded mortgage had priority over a later-recorded mortgage, and equity—and therefore equitable subrogation—was used by the courts to overcome the plain language of the statute only in the presence of unusual circumstances such as fraud or mutual mistake. *Ameriquest . . . .* However, Michigan's recording statute was amended by 2008 PA 357, eliminating the former MCL 565.25(1) and (4). Because the analysis in *Ameriquest* relied on those former subsections, *Ameriquest* is no longer controlling. [Citations and quotation marks omitted[12].]

---

[11] The *Ameriquest* panel noted that "Michigan's status as a recording priority jurisdiction has existed since, at least, 1897 CL 8980." *Ameriquest*, 273 Mich App at 93 n 3.

[12] In *Ameriquest*, this Court did not rely on nor even cite the general race-notice statute, MCL 565.29, which is applicable to mortgages although not nearly as precisely as MCL 565.25. Thus, the *CitiMortgage* panel did not entertain the question whether the statutory theory underlying *Ameriquest* and the deconstruction of equitable subrogation might remain applicable, but under MCL 565.29 instead of the amended version of MCL 565.25. Moreover, such an argument was

-12-

The parties do not dispute the general application of race-notice principles; therefore, as a starting point, the Capitol mortgage, which was not discharged, had priority over the subsequently-recorded Option One mortgage, which was the junior or second mortgage upon its recordation in 2005, with the original Option One mortgage being satisfied and discharged. In light of these circumstances, Wells Fargo, as an assignee of Option One, turned to the doctrine of equitable subrogation in an attempt to have the Option One mortgage placed in the same priority position that had been enjoyed by the original Option One mortgage.

In *CitiMortgage*, this Court indicated "that the caselaw . . . in Michigan is consistent with Restatement Property, 3d, Mortgages, § 7.3, pp 472-473[.]" *CitiMortgage*, 295 Mich App at 76.[13] The *CitiMortgage* panel next examined the commentary to § 7.3 of the Restatement and then set forth its ruling:

---

apparently not made in *CitiMortgage*. The parties here do not present an argument that *Ameriquest* should be resurrected or that *CitiMortgage* improperly relegated *Ameriquest* to the scrapheap of no-longer controlling opinions. And *CitiMortgage* is binding precedent. MCR 7.215(J)(1). Accordingly, we decline to examine whether MCL 565.29 dictates the same limitations on the doctrine of equitable subrogation as those placed on the doctrine in *Ameriquest*.

[13] This Court proceeded to quote the entire Restatement, which provides:

(a) If a senior mortgage is released of record and, as part of the same transaction, is replaced with a new mortgage, the latter mortgage retains the same priority as its predecessor, except

(1) to the extent that any change in the terms of the mortgage or the obligation it secures is materially prejudicial to the holder of a junior interest in the real estate, or

(2) to the extent that one who is protected by the recording act acquires an interest in the real estate at a time that the senior mortgage is not of record.

(b) If a senior mortgage or the obligation it secures is modified by the parties, the mortgage as modified retains priority as against junior interests in the real estate, except to the extent that the modification is materially prejudicial to the holders of such interests and is not within the scope of a reservation of right to modify as provided in Subsection (c).

(c) If the mortgagor and mortgagee reserve the right in a mortgage to modify the mortgage or the obligation it secures, the mortgage as modified retains priority even if the modification is materially prejudicial to the holders of junior interests in the real estate, except as provided in Subsection (d).

(d) If a mortgage contains a reservation of the right to modify the mortgage or the obligation as described in Subsection (c), the mortgagor may issue a notice to the mortgagee terminating that right. Upon receipt of the notice by the mortgagee, the right to modify with retention of priority under Subsection (c) becomes ineffective against persons taking any subsequent interests in the

-13-

Of particular note, comment b to this section of the Restatement provides that "[u]nder § 7.3(a) a senior mortgagee that discharges its mortgage of record and records a replacement mortgage does not lose its priority as against the holder of an intervening interest unless that holder suffers material prejudice." The associated Reporters' Note, voluminously citing many cases from other jurisdictions, explains that "[c]ourts routinely adhere to the principle that a senior mortgagee who discharges its mortgage of record and takes and records a replacement mortgage, retains the predecessor's seniority as against intervening lienors unless the mortgagee intended a subordination of its mortgage or 'paramount equities' exist."

. . . [W]e conclude that § 7.3 of the Restatement, limited to the situations described by the quoted commentary—specifically, cases in which the senior mortgagee discharges its mortgage of record and contemporaneously takes a replacement mortgage, as often occurs in the context of refinancing—is consistent with Michigan precedent. Thus limited, because § 7.3 of the Restatement reflects the present state of the law in Michigan, we hereby adopt it. We caution, however, that the lending mortgagee seeking subrogation and priority over an intervening interest relative to its newly recorded mortgage *must be the same lender* that held the original mortgage before the intervening interest arose; and, furthermore, any application of equitable subrogation is subject to a careful examination of the equities of all parties and potential prejudice to the intervening lienholder.

* * *

We [hold] that equitable subrogation is available to place a new mortgage in the same priority as a discharged mortgage if the new mortgagee was the original mortgagee and the holders of any junior liens are not prejudiced as a consequence. We further conclude that the Restatement, in the limited form in which we have adopted it, sets forth a reasonable and proper framework for determining whether junior lienholders have been prejudiced and whether the equities ultimately favor equitable subrogation. Because the trial court is the forum best suited to evaluating any prejudice and the competing equities, including making any relevant factual determinations, we remand this matter to the trial court to do so. [*CitiMortgage*, 295 Mich App at 77, 81 (citations omitted; initial two alterations and emphasis in original).]

*CitiMortgage* involved a fact pattern that is similar to the history in our case, except that there was no subordination attempt in *CitiMortgage* and, more importantly, *CitiMortgage* addressed a pure refinancing transaction, absent an increase in the principal amount and the lending of new or additional monies. This latter distinction served as a basis, in part, for the trial

mortgaged real estate, and any subsequent modifications are governed by Subsection (b). Upon receipt of the notice, the mortgagee must provide the mortgagor with a certificate in recordable form stating that the notice has been received.

court's rejection of Wells Fargo's equitable subrogation argument. We hold that the trial court erred in so ruling.[14]

The framework enunciated in *CitiMortgage* did not indicate that equitable subrogation is wholly unavailable if funds are lent to a mortgagor above and beyond the amount needed to satisfy and discharge the original loan. The Court observed that the theory underlying equitable subrogation is that a junior lienholder's position is left unchanged by the conduct of the lender seeking subrogation and that the junior lienholder is not wronged or otherwise prejudiced as a consequence. *CitiMortgage*, 295 Mich App at 80.[15] When new money is added to an otherwise ordinary refinancing transaction, a junior lienholder's position will generally be changed to its detriment if equitable subrogation is permitted, but only to the extent of the increase in the principal amount. Absent the increase or new money, with all other pertinent variables not being impactful, the extent of the available recovery or the amount needed to redeem property arising out of any foreclosure proceedings would be the same for the junior lienholder as before the execution of the new or replacement mortgage. In other words, the junior lienholder's margin of protection would be unchanged upon invocation of equitable subrogation. With new money being lent and an increase in the principal amount, the extent of the available recovery would be diminished or the amount needed to redeem property would increase for the junior lienholder as compared to before the execution of the replacement mortgage, making the increase in the principal amount prejudicial should equitable subrogation be allowed. Stated otherwise, the junior lienholder's margin of protection would be reduced upon invocation of equitable subrogation. Simply put, the more money to which a mortgagee asserting equitable subrogation becomes entitled (or the greater the mortgagor's obligation under the replacement mortgage), the lesser protection or greater the potential loss for the junior lienholder.

Our view is consistent with language in comment b, p 475, of the Restatement, § 7.3, wherein it is stated:

> Other sorts of changes that may be made in the terms of a replacement mortgage are not so benign. *Obviously an increase in the principal amount will prejudice the holders of junior interests; see Illustration 2.* Unless the original mortgage validly secures future advances . . ., it would be unfair to subordinate the intervening lienor to a replacement mortgage balance that it would have no reason to anticipate. [Emphasis added[16].]

---

[14] We note that there is no dispute that the mortgagee relative to the original mortgage and the new mortgage was the same entity, Option One, thereby satisfying that component of equitable subrogation as required by *CitiMortgage*.

[15] We recognize that a junior lienholder becomes a senior lienholder upon recordation of the replacement mortgage and discharge of the original mortgage, but for ease of reference, we shall speak of the junior lienholder, meaning the intervening mortgagee that recorded its mortgage after the original mortgage was recorded but before the replacement or new mortgage was recorded.

[16] Illustration 2 must be read in conjunction with illustration 1, and those two illustrations provide as follows:

The Reporters' Note to Restatement, § 7.3, explains that "courts usually regard an increase in the mortgage interest rate or principal amount as causing a *pro tanto* loss of priority to any intervening liens." *Id.* at 485.[17]

We agree with and adopt the Restatement approach set forth in comment b, the illustrations, and the Reporter's Note as cited and discussed above. The original Option One mortgage was not a future advance mortgage,[18] and permitting equitable subrogation with respect to the new monies that increased the principal amount to $520,000 when the balance owing on the original Option One mortgage was $458,109 would be prejudicial. There is nothing in the record indicating that Capitol could have anticipated a replacement mortgage with

> 1. Mortgagor borrows $50,000 from Mortgagee-1 and gives Mortgagee-1 a promissory note for that amount secured by a mortgage on Blackacre. The mortgage obligation carries a fixed rate of interest and is to be amortized by fixed payments over 15 years. The mortgage is immediately recorded. Thereafter, Mortgagor borrows $10,000 from Mortgagee-2 and gives Mortgagee-2 a promissory note for that amount secured by a mortgage on Blackacre. The latter mortgage is promptly recorded. Two years later, when the balance on Mortgagee-1's mortgage is $49,000, Mortgagor and Mortgagee-1 agree to a replacement mortgage. Mortgagee-1 releases its original mortgage of record and Mortgagor delivers to Mortgagee-1 a new promissory note for $49,000 secured by a mortgage on Blackacre. The mortgage obligation carries the same fixed rate of interest as its predecessor and is evenly amortized over 20 years. A few days later, Mortgagee-1 records the replacement mortgage. The latter mortgage is senior to Mortgagee-2's mortgage.

> 2. The facts are the same as Illustration 1, except that the replacement mortgage delivered to Mortgagee-1 secures a $60,000 obligation. Mortgagee-1's replacement mortgage is senior to Mortgagee-2's mortgage *except to the extent of $11,000* and interest accruing thereon. [Restatement, § 7.3, comment b, p 476 (emphasis added).]

[17] We note that the initial interest rate on the original 2003 Option One mortgage was 8.100% subject to possible increases based on market rates starting January 1, 2006. The interest rate could never go below 8.100% and had a ceiling of 14.100%. The 2005 Option One mortgage had an initial interest rate of only 6.900% subject to possible increases based on market rates starting May 1, 2008. The interest rate could never go below 6.900% and had a ceiling of 12.900%. Both mortgages were for 30-year terms.

[18] Restatement, § 7.3, comment b, p 475, notes the following regarding future advance mortgages:

> Where the original mortgage clearly states that it secures future advances and specifies no maximum monetary amount, the intervening lienor is not materially prejudiced. Since the intervenor takes its lien on notice that future advances are possible, it cannot validly claim injury based on the fact that the replacement mortgage exceeds the pre-release balance of its predecessor.

an increase in the principal amount when Capitol made the loan to the mortgagors and obtained its mortgage in 2004. Accordingly, Wells Fargo is not entitled to equitable subrogation in regard to the new or additional monies given the resulting prejudice; priority was lost to the Capitol mortgage as to those funds.

Wells Fargo argues, however, that the issue of prejudice is irrelevant, invoking Restatement, § 7.3(c), which provides that "[i]f the mortgagor and mortgagee reserve the right in a mortgage to modify the mortgage or the obligation it secures, the mortgage as modified retains priority even if the modification is materially prejudicial to the holders of junior interests in the real estate . . . ." Paragraph 26 of the original Option One mortgage provided that "[t]his Security Instrument may be modified or amended . . . by an agreement in writing signed by Borrower and Lender." Wells Fargo contends that given this language in the original Option One mortgage, equitable subrogation should apply to the entire 2005 Option One mortgage, including the new monies that were lent to the mortgagors, regardless of any prejudice. We first note that while the *CitiMortgage* panel quoted Restatement, § 7.3(c), it is not clear that it actually adopted that specific provision, where it later stated that it was adopting Restatement, § 7.3, as limited to the situations described in the commentary that the Court had quoted, which commentary did not discuss mortgage modification language. *CitiMortgage*, 295 Mich App at 77. Regardless, the 2005 Option One mortgage did not entail a mere modification of the original mortgage; rather, it was a true replacement mortgage, resulting in the satisfaction, discharge, and cancelation of the original mortgage in its entirety. Accordingly, we reject Wells Fargo's argument on this matter.

With respect to the question of whether it would be prejudicial to apply equitable subrogation relative to lent funds *other than the new or additional monies*, Capitol's position would have been left unchanged and thus we cannot identify any resulting prejudice. Indeed, the general overall reduction in the interest rate reflected in the 2005 Option One mortgage would likely have been favorable to Capitol, not prejudicial.[19] That said, there are a variety of other issues regarding the application of equitable subrogation that we must still review and resolve.

First, the trial court ruled that a claim of equitable subrogation is subject to a six-year statute of limitations and that Wells Fargo's assertion of the doctrine was time-barred. The trial court, agreeing with SBC and Capitol, invoked the catch-all statute of limitations found in MCL 600.5813, which provides that "[a]ll other personal actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a different period is stated in the statutes." On appeal, Wells Fargo contends that the applicable limitations period for equitable subrogation is 15 years under MCL 600.2932 and MCL 600.5801(4).

The trial court's ruling reflected a misunderstanding of the doctrine of equitable subrogation. The doctrine is not a cause of action, such that it would be subject to its own statute of limitations. Rather, equitable subrogation, in the context of its desired employment in this

---

[19] An *increase* in the interest rate may materially prejudice junior lienholders. Restatement, § 7.3, comment b, p 475. "The reason is that the junior interest-holder's margin of protection in the real estate is reduced to the extent that a higher interest rate, like an additional principal advance, increases the amount of the senior mortgage obligation." *Id.*

case, is simply a mechanism to realign mortgage priorities as part of a suit to determine an interest in land under MCL 600.2932.[20] An action to quiet title, i.e., to determine an interest in real property, brought under MCL 600.2932 is subject to the 15-year limitations period in MCL 600.5801(4). *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 719; 742 NW2d 399 (2007). Count IV of Wells Fargo's complaint alleged equitable subrogation, and count V claimed a superior interest in land (quiet title), effectively on the basis of the debunked discharge of mortgage and equitable subrogation. Confusion might have been minimized had Wells Fargo not alleged a separate count for equitable subrogation, as the argument in favor of equitable subrogation should simply have been encompassed by the quiet-title count. An argument asserting equitable subrogation will effectively be precluded if a quiet-title action wherein the doctrine is raised is not maintained within the 15-year statute of limitations applicable to quiet-title actions. But, technically, there is no limitations period specifically for equitable subrogation. Wells Fargo's claim seeking to determine an interest in land, and more specifically the priority of an interest, was pursued well within the applicable 15-year statute of limitations; therefore, Wells Fargo was not precluded from presenting an equitable subrogation argument.

With respect to the effect of the assignment of the Option One mortgage to Wells Fargo on the analysis concerning equitable subrogation, this Court has stated that "[i]t is well established that an assignee stands in the shoes of an assignor, acquiring the same rights and being subject to the same defenses as the assignor." *Coventry Parkhomes*, 298 Mich App at 256-257. Upon an assignment of a mortgage, the assignee, for all beneficial purposes, becomes a party to the mortgage, and "a mortgage assignee has the same priority rights as the original mortgage assignor." *Id.* at 257. In *CitiMortgage*, 295 Mich App at 78 n 2, this Court made clear that these general assignment principles pursuant to which an assignee stands in the shoes of the assignor are equally applicable for purposes of equitable subrogation analysis. Accordingly, the fact that Wells Fargo was not a direct party to the Option One mortgage but an assignee does not alter our ruling regarding the availability of equitable subrogation. Further, our conclusion is not changed by the fact that Wells Fargo was aware at the time of the assignment that the public record revealed the existence and superiority of the Capitol mortgage. To hold otherwise would stymie assignments and effectively preclude assignees from invoking equitable subrogation, which is only necessary to pursue in the first place when the public record reveals that another lien exists and is superior. Had it not been Wells Fargo as an assignee seeking equitable subrogation, it would have been the original mortgagee itself – Option One. And Wells Fargo's knowledge would have no bearing on whether prejudice would be incurred by Capitol or SBC in permitting equitable subrogation.

---

[20] MCL 600.2932(1) provides:

> Any person, whether he is in possession of the land in question or not, who claims any right in, title to, equitable title to, interest in, or right to possession of land, may bring an action in the circuit courts against any other person who claims or might claim any interest inconsistent with the interest claimed by the plaintiff, whether the defendant is in possession of the land or not. [See also MCR 3.411.]

SBC and Capitol argue that equitable subrogation is not available because Option One had intended to subordinate the 2005 Option One mortgage to the Capitol mortgage, given that Option One realized early on that there was no effective discharge of the Capitol mortgage and that the Capitol mortgage had been excepted from coverage under the title insurance policy, yet Option One did nothing in response. The *CitiMortgage* panel, quoting the Reporters' Note to Restatement, § 7.3, p 483, observed that a senior mortgagee who discharges its mortgage and takes a replacement mortgage cannot avail itself of equitable subrogation if it intended a subordination of its replacement mortgage to the existing junior mortgage. *CitiMortgage*, 295 Mich App at 77. We conclude that the documentary evidence established that Option One intended just the opposite of that being claimed by SBC and Capitol. Option One's closing instructions to the title company and the effort to obtain the discharge of mortgage from Capitol showed that Option One fully intended to retain its senior lien position at the time of the 2005 mortgage. The alleged failure by Option One thereafter to timely address the circumstances did not reveal an intent to subordinate its mortgage to the Capitol mortgage, but was more in the nature of neglect at worst.

Next, SBC argues that it was a bona fide purchaser for value and thus protected by MCL 565.29, which, again, provides:

> Every conveyance of real estate within the state hereafter made, which shall not be recorded as provided in this chapter, shall be void as against any subsequent purchaser in good faith and for a valuable consideration, of the same real estate or any portion thereof, whose conveyance shall be first duly recorded.

SBC contends that at the time it was assigned the Capitol mortgage in August 2013, it did not have actual or constructive notice of the original Option One mortgage given its discharge, nor did it have notice of Wells Fargo's equitable subrogation claim.[21] SBC maintains that "the public record was replete of any evidence of an alleged valid superior mortgage on the same property" when SBC was assigned the mortgage.[22]

---

[21] SBC's argument is poorly worded. We do not construe the argument as suggesting that the original Option One mortgage was no longer viewable at the register of deeds office upon recordation of the discharge of said mortgage, although the argument is susceptible to such an interpretation. If that is the argument it would fail, given that the original Option One mortgage would remain recorded and on display despite its discharge, and the discharge itself, which was recorded, referenced the existence of the original Option One mortgage. Thus, SBC had notice of the original Option One mortgage. It appears that what SBC is attempting to contend is simply that it obtained the assignment without notice that Option One, and thus Wells Fargo, had a potentially viable priority claim, considering the recorded discharge of the original Option One mortgage that placed Capitol in the senior lien position.

[22] Although the trial court found that SBC had been a bona fide purchaser for value in dissolving and terminating the TRO and preliminary injunction, the court did not rely on nor address the principle in ruling on the motions for summary disposition. Given that the issue of whether SBC was a bona fide purchaser for value had been presented for consideration at summary

-19-

Under MCL 565.29, a bona fide or good-faith purchaser for value of an interest in real property may take priority over a prior conveyed interest. *Penrose v McCullough*, 308 Mich App 145, 152; 862 NW2d 674 (2014). "And a good-faith purchaser is one who purchases [property] without notice of any defect in the vendor's title." *Id.* A person having notice of a possible defect in title who fails to make further inquiry into the potential rights of a third-party does not constitute a good-faith purchaser. *Id.* at 153. Notice, which can be actual or constructive, "is whatever is sufficient to direct attention of the purchaser of realty to prior rights or equities of a third party and to enable him to ascertain their nature by inquiry." *Id.* (citation and quotation marks omitted). Constructive notice involves imputed notice to a person regarding all matters properly of record. *Id.*

In the simplest of hypotheticals, MCL 565.29 dictates that a mortgagee who first obtains a mortgage but fails to record it loses to a subsequent mortgagee who obtains a mortgage relative to the same property and records the mortgage, so long as the subsequent mortgagee gave value for the mortgage and lacked notice of the first mortgage. Here, SBC is not arguing that it did not have notice of the 2005 Option One mortgage, which was duly recorded. Rather, SBC is maintaining that it lacked notice that the Option One mortgage might potentially be given priority over the Capital mortgage that was assigned to SBC under the doctrine of equitable subrogation. "A party's status as a bona fide purchaser for value is relevant only when there has been a *previously unrecorded conveyance*." *Trademark Props of Mich, LLC v Fed Nat'l Mtg Ass'n*, 308 Mich App 132, 142 n 4; 863 NW2d 344 (2014) (emphasis added), citing MCL 565.29.[23] The bona-fide-purchaser argument posed by SBC does not rely on a previously unrecorded conveyance that allegedly constituted a defect of which it had no notice. But SBC is not arguing that its bona-fide-purchaser status is irrelevant or that equitable subrogation is unavailable as a matter of law under MCL 565.29 simply because the Capitol mortgage was the senior mortgage on the public record. Instead, SBC appears to be maintaining that it had no notice of the possibility of an equitable subrogation claim. Essentially, SBC is equating an equitable-subrogation interest (a prospective claim of equitable subrogation) to a "previously unrecorded conveyance," which equitable-subrogation interest can be defeated if a subsequent mortgagee acquires a mortgage for a valuable consideration and records it absent notice of a viable claim for equitable subrogation.

Assuming for the sake of argument that the premise of SBC's theory is sound, i.e., that a mortgage interest conveyed to a bona fide purchaser for value is superior to an earlier-arising, equitable-subrogation interest, which of course would be unrecorded, SBC cannot show that it

---

disposition, we will address SBC's argument as a potential alternative basis to affirm the trial court's ruling.

[23] It appears that the *Trademark Props* panel's point was that if there has been a previously *recorded* conveyance, the party recording that conveyance would generally prevail as being the first to record, making the subsequently-recorded conveyance subordinate or junior and entirely undermining any bona-fide-purchaser claim, considering the existence of record notice. The panel did not address an equitable subrogation claim.

was indeed a bona fide purchaser for value.[24]  For the reasons set forth below, the record was sufficient so as to have directed SBC's attention to the rights or equities of Option One's assignee Wells Fargo and enabled SBC to ascertain the nature of those rights or equities by inquiry.  *Penrose*, 308 Mich App at 153.  Therefore, SBC had notice of a possible priority claim by Wells Fargo at the time that SBC was assigned the Capitol mortgage.

First, *CitiMortgage* had been the law in Michigan for approximately two years when SBC was assigned the Capitol mortgage; therefore, in light of the public record showing the original 2003 Option One mortgage, the 2004 Capitol mortgage, the 2005 Option One mortgage, and the soon-thereafter discharge of the original Option One mortgage by Option One itself, SBC should have been aware of an available claim of equitable subrogation by Wells Fargo.  Second, the affidavit by the asset manager for SummitBridge and SBC averred that "SBC was made aware of the civil action filed by Wells Fargo against [Capitol] . . . in 2013," which was a reference to the previous quiet-title suit brought by Wells Fargo.  Although Wells Fargo did not assert an argument for equitable subrogation in the 2013 quiet-title action, Wells Fargo did claim that there had been a discharge of the Capitol mortgage and that it ultimately had superior title. While SBC was assigned the mortgage seven days after the quiet-title action was dismissed, the dismissal was without prejudice, leaving open the possibility of future litigation over priority of the mortgages.  Under these circumstances, we conclude that SBC had notice of a possibility that the outwardly-appearing priority of the Capitol mortgage might be in peril, thereby necessitating further inquiry.  Accordingly, SBC was not a good-faith purchaser for purposes of MCL 565.29.[25]

Finally, Capitol argues that equitable subrogation is not available under Restatement, § 7.3(a)(2), which provides an exception to the doctrine "to the extent that one who is protected by the recording act acquires an interest in the real estate at a time that the senior mortgage is not of record."  Assuming that *CitiMortgage* adopted this provision, the comment and illustration make clear that § 7.3(a)(2) applies in cases where a senior mortgagee has recorded a discharge of its original mortgage but has yet to record its replacement mortgage, which was executed and used to satisfy the original mortgage, and a second mortgagee comes along and records its mortgage before the replacement mortgage is recorded.  Restatement, § 7.3, comment b, p 476, and illustration 6, p 478.  Here, the original Option One mortgage had not yet been discharged and was fully applicable when Capitol obtained its mortgage.  Accordingly, § 7.3(a)(2) does not provide a basis to reject Wells Fargo's claim of equitable subrogation.

---

[24] We do question the soundness of SBC's theory, considering that the whole purpose of the doctrine of equitable subrogation is to allow a mortgagee whose mortgage is the junior lien in the public record to attain senior lien status.

[25] To the extent that SBC is contending that it needed to have notice that a claim for equitable subrogation had actually been asserted, whether in a court action or correspondence, prior to SBC being assigned the Capitol mortgage, we reject the argument.  As indicated, notice can be actual or constructive, and an examination of the public record at the register of deeds office would have shown that the circumstances were ripe for a claim of equitable subrogation.

### III.  CONCLUSION

The trial court did not err in dismissing counts I, II, III, V (mortgage discharge component), and VI of Wells Fargo's complaint, considering that the purported discharge of mortgage was ineffective and unenforceable as a matter of law for failure to satisfy conditions precedent.  With respect to count IV alleging equitable subrogation, we conclude that it was subsumed by count V, which alleged mortgage superiority partly on the basis of equitable subrogation.  And the trial court did err in dismissing count V relative to the issue of equitable subrogation, but only to the extent that the court ruled that equitable subrogation was unavailable with respect to amounts not encompassing the new or additional monies.  There was no error in excluding the new monies or the increase in the principal amount from being subject to equitable subrogation.  We remand for entry of judgment in favor of Wells Fargo on count V consistent with this opinion.  To be clear, SBC retains title to the property purchased at the sheriff's sale, but that ownership interest is subject to Wells Fargo's equitably-subrogated mortgage interest as outlined by our ruling.  See MCL 600.3236.[26]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.  Neither party having fully prevailed, we decline to award taxable costs pursuant to MCR 7.219.


/s/ William B. Murphy
/s/ Jane E. Markey
/s/ Amy Ronayne Krause

---

[26] MCL 600.3236 provides:

> Unless the premises described in such deed shall be redeemed within the time limited for such redemption as hereinafter provided, such deed shall thereupon become operative, and shall vest in the grantee therein named, his heirs or assigns, all the right, title, and interest which the mortgagor had at the time of the execution of the mortgage, or at any time thereafter, except as to any parcel or parcels which may have been redeemed and canceled, as hereinafter provided; and the record thereof shall thereafter, for all purposes be deemed a valid record of said deed without being re-recorded, but no person having any valid subsisting lien upon the mortgaged premises, or any part thereof, created before the lien of such mortgage took effect, shall be prejudiced by any such sale, nor shall his rights or interests be in any way affected thereby.